**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 17-2945
_____

UNITED STATES OF AMERICA


v.


MUADHDHIN BEY,
Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D. C. Criminal No. 2-16-CR-00290-001)
District Judge:  Honorable Wendy Beetlestone

_____

Argued on July 19, 2018

Before: McKEE, VANASKIE, and RESTREPO, <u>Circuit</u>
<u>Judges</u>

(Opinion filed:  December 21, 2018)

Brett G. Sweitzer, Esquire          (**Argued**)
Kathleen Gaughan, Esquire
Federal Community Defender Office for the Eastern District
of Pennsylvania
601 Walnut Street
The Curtis Center, Suite 540 West
Philadelphia, PA 19106
                  Counsel for Appellant

Robert A. Zauzmer, Esquire              (**Argued**)
Jonathan B. Ortiz, Esquire
Office of the United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106
                    Counsel for Appellee

_____

OPINION OF THE COURT

_____


McKEE, Circuit Judge

Muadhdhin Bey appeals the district court's denial of his motion to suppress physical evidence seized from him during a search incident to a *Terry* stop. Although we agree with the district court's conclusion that the initial stop was supported by reasonable suspicion, we conclude that the continuation of that stop, after police should have realized that Bey did not resemble the fleeing suspect they were looking for, violated the Fourth Amendment. Accordingly, we hold that the district court erred in denying Bey's motion to suppress. We will therefore reverse the court's denial of Bey's motion to suppress and vacate the judgment of conviction.

**I.**
**A.     Factual Background**

**Police Stop a Car Containing Amir Robinson**

At around 10 p.m. on March 28, 2016, Philadelphia Police Officers William Fritz and Brandon McPoyle saw a white Buick fail to come to a complete stop at a stop sign. The Buick continued into a neighborhood that officers described as a "violent area," known for drug distribution. After following the car for three blocks, the officers turned on the overhead lights of their marked patrol car and pulled the car over. The car contained three men – the driver, a front passenger, and a

2

rear driver's-side passenger. Amir Robinson was the front passenger; Lionel Burke was the back seat passenger. Officer Fritz would later describe Robinson as an average-sized Black male who was wearing a "red hoodie or jacket." (App. 60-61.)

Each of the three occupants produced identification, which officers returned after a warrant check failed to disclose any outstanding warrants. However, officers noticed the smell of marijuana and saw marijuana residue on the car's floor while attempting to identify the passengers. Consequently, they decided to remove the three men from the car to search for drugs.

The rear passenger, Lionel Burke, was removed and frisked first. After Burke was frisked, but before McPoyle returned him to the car, Fritz noticed a gun on the floor of the back seat where Burke had been sitting. Fritz recovered the gun, verified that it was real, and told McPoyle to arrest Burke. Before McPoyle could handcuff Burke, Burke "did a football maneuver where he spun around" McPoyle and fled northbound. (App 59.) Beginning at approximately 10:01 p.m., the officers broadcast their locations over police radio.[1]

### Robinson Flees the Traffic Stop

When Fritz looked back toward the Buick, he noticed that the front passenger door was open and Robinson (the front passenger) had also fled. Fritz assumed that Robinson must have "gone westbound," which was opposite of Burke's direction of flight. (App. 63, 85.) Seconds after 10:02 p.m., McPoyle radioed that he had apprehended and arrested Burke.[2] At 10:03 p.m., Fritz radioed that they had recovered a gun, that the driver of the car was in custody, and that the passenger had fled.

At 10:04 p.m., approximately three minutes after Fritz called for back-up, Officer John Madara arrived at the scene, and Fritz briefly described Robinson to Madara. At 10:06

---

[1] *United States v. Bey*, No. 16-CR-290, 2017 WL 875364, at *2 (E.D. Pa. Mar. 6, 2017).

[2] *Id.*

p.m., Madara relayed that description over the radio.[3] Madara broadcast that Robinson was a Black male, approximately 6'0"-6'1", 160-170 pounds, wearing dark blue pants and a red hoodie and headed west from their location. Notably, the description of Robinson did not mention a long beard or any facial hair.

Officers Ernest Powell and Philip Cherry heard Officer Fritz's initial call for back-up and Officer Madara's subsequent broadcast of Robinson's description. The officers arrived at the scene just after 10:06 p.m., and Powell spoke with Madara about the description of Robinson. Powell was able to view a photographic picture of Robinson on the computer screen in his patrol car (the Mobile Data Terminal or "MDT"). Having viewed the MDT picture and with a full description including name, address, age, ethnicity, approximate height and weight, and clothing, Officers Powell and Cherry began searching for Robinson in the general direction of his flight.[4] They started their pursuit of Robinson at 10:07 p.m.[5] Given their experience and knowledge of the area, as well as the very short time interval involved, Powell and Cherry assumed Robinson may be nearby at Lid's Café, a local bar that was only one block away, where he might try to blend in.

### Officers Stop Bey, Believing Bey to be Robinson

Less than one minute after meeting with Officer Madara, and mere seconds after seeing Robinson's picture on their MDT, Officers Powell and Cherry saw an individual, who would later be identified as Muadhdhin Bey, walking out of Lid's Café.

Bey was a 32 year-old, dark-skinned African American man with a long beard. He weighed about 200 pounds and was wearing black sweatpants and a red puffer jacket with a hood. Amir Robinson, the suspect officers were searching for, on the other hand, was a 21 year-old, light-skinned African American man with very little hair under his chin and a tattoo on his neck. He weighed around 160-170 pounds and was wearing dark blue pants and a red hoodie (or red jacket) when he fled from

---

[3] *Id.*

[4] *Id.* at *3.

[5] *Id.*

the police. Although Bey's clothing resembled the description of Robinson's clothing, Bey was more than a decade older, much darker in complexion, much heavier and had significantly more facial hair than Robinson.

When police noticed Bey walking out of Lid's Café, they could not see Bey's face because he was facing away from them, but they noticed his red, hooded puffer jacket and black sweatpants.[6] Officer Powell testified that he could not identify Bey's race upon first seeing him, but he later testified that when he saw Bey, he told Officer Cherry "[h]ey, that's the red jacket, the black guy, red jacket."[7] (App. 115.) Both officers stated that they drew their guns, approached Bey, and ordered him to show his hands. Bey immediately put his hands in the air and turned around to face the officers.

### Officers Continue to Detain Bey After He Turns Around

At this point, the officers' testimony conflicted and the district court rejected some of the testimony because the Court found that Officer Powell was not completely credible. Officer Powell testified that the scene was well-lit and his view of Bey was unobstructed. At the suppression hearing, Powell testified that he asked Bey if he had a weapon and Bey told him that he had a gun on his waist, which Officer Cherry recovered.[8]

---

[6] As the district court noted, "the parties dispute the content of the verbal description that Madara gave Powell. At the suppression hearing Powell testified that Madara told him Robinson was wearing a red *jacket* (as opposed to a hoodie). The arrest report and all of Madara's radio broadcasts describe Robinson as wearing a red hoodie." *Bey*, 2017 WL 875364, at *3 n.4.

[7] The Government asked Officer Powell: "When you arrive at [Lid's café] and you saw the person who turned out to be [Bey], did the person that appeared to you appear to be a black male?" Officer Powell responded, "Yes." (App. 169.)

[8] *Bey*, 2017 WL 875364, at *5. The district court explained why it did not believe this portion of Officer Powell's testimony:

5

However, Officer Powell also testified at that same hearing that he told Bey to get on the ground, that Bey complied, and he (Powell) "approached and removed from [Bey's] front waistband a black .45 caliber handgun" himself. (App. 119.) No matter which account is true, it is clear that police recovered a gun from Bey.

At 10:08 p.m., approximately eight minutes after Robinson fled, Officer Powell broadcast "gun recovered, one in custody."[9] Officer Madara testified that when he heard

> Powell first disclosed it during a meeting with the U.S. Attorney and an FBI agent in December 2016—over eight months after Bey's arrest. The arrest memo, which was entered into evidence at the suppression hearing, does not include anything reflecting this alleged Statement. In relevant part, it states:
>
> Police ordered the male to stop and show his hands to police. Police had their weapons drawn because of the nature of the job, a person with a gun. The male complied by dropping to the ground as ordered by police. Police conducted a safety frisk of the male, at that time police recovered a black in color tenifer finished Glock 37 .45 ACP handgun from his front waistband.

*Id*. at *4. The court also found that Officer Powell did not mention the alleged confession during the state preliminary hearing either. Therefore, the court held:

> Given the importance of the alleged admission from Bey that a gun was in his waistband to any prosecution, and the incriminating effect of such an admission, the fact that it was not included in the arrest memo or mentioned in Powell's state court testimony—and only surfaced eight months after the arrest, during a meeting in preparation for this case—undermines the credibility of Powell's testimony on this point.

*Id*. at *4–5.
[9] *Id*. at *5.

Officer Powell's 10:08 p.m. broadcast, he drove to Lid's Café to see if the person in custody was actually Robinson. Officer Madara arrived at the bar between 10:08 p.m. and 10:09 p.m.[10] When he arrived, Officer Powell and Officer Cherry told him that Bey was not Robinson.[11] Officer Madara then viewed Robinson's picture on his MDT. At 10:09 p.m., he broadcast that police had arrested a different male and "[w]e're still looking for Amir Robinson."[12]

## B. Procedural History

Bey was transported back to the police station and charged with being a felon in possession of a firearm. He subsequently moved to suppress the gun arguing that the description that Officers Powell and Cherry were given was too generic to support reasonable suspicion to seize him. He also argued that even if police had reasonable suspicion to justify the initial detention, that suspicion dissipated when Bey turned around and the officers saw his face, his size, his facial hair, and the age discrepancy between him and Robinson. Bey argues that because police had seen a picture of Robinson moments before seizing him, the officers therefore knew, or should have known, that he (Bey) was not Robinson.

The district court correctly ruled that the seizure occurred the moment Bey submitted to police authority by raising his hands and turning to face the officers who had drawn their guns.[13] The court found that the officers had

---

[10] *Id.* at *6.

[11] *Id.*

[12] *Id.* Officer Powell's version of events following the arrest of Bey differed. Powell claimed that after arresting Bey, he and Officer Cherry drove Bey back to the initial location for an identification. Given that Officer Madara's account matched the radio dispatch records, however, the district court concluded that Officer Madara's testimony was true. *Id.*

[13] *Bey*, 2017 WL 875364, at *7 ("Bey's compliance was not momentary; he continued to comply with police commands throughout the stop and frisk. Therefore, Bey submitted to the officers' show of authority, and was seized for Fourth Amendment purposes, when he turned around with his hands raised.").

7

reasonable suspicion to justify that seizure based on numerous factors including the reliability of the description, the physical and temporal proximity of the detention to the vehicle stop, and Bey's initial appearance.[14] The court found that "[t]he description was sufficiently particularized to permit the police to be reasonably selective in determining whom to stop for investigation."[15]

The district court also ruled that reasonable suspicion did not dissipate when Bey turned to face the officers, even though they then were able to get a good look at his face and features.[16] While acknowledging that Bey is darker-skinned, much heavier, and significantly older than Robinson, the court noted that those comparisons came not from the photo that officers saw on the MDT at the scene, but from a photo of Robinson that was taken six months later when he was finally arrested.[17] Therefore, in the court's eyes, the post-hoc comparison of the physical features of Robinson and Bey was of little probative value because it did not address whether the photo officers saw sufficiently resembled Bey the night of the incident.[18]

At the conclusion of the suppression hearing, the court denied Bey's motion to suppress, and this appeal followed.[19]

## II.

---

[14] *Id*. at *10.

[15] *Id*. ("It is not unreasonable that a police officer would perform an investigatory seizure of a black male wearing a red hooded jacket and dark pants under these circumstances, given the geographic and temporal proximity of the seizure to the car stop, and the fact that the location was a high crime area.").

[16] *Id*. at *11–12.

[17] *Id*. at *11.

[18] *Id*.

[19] We review *de novo* the district court's conclusion that the detention and arrest were consistent with Fourth Amendment limitations; we review for clear error the court's findings of fact. *United States v. Harple*, 202 F.3d 194, 196 (3d Cir. 1999).

The Fourth Amendment prohibits "unreasonable searches and seizures."[20] Evidence obtained through unreasonable searches and seizures must be suppressed as "fruit of the poisonous tree."[21] Generally, for a search or seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based upon probable cause.[22] Warrantless searches and seizures are presumptively unreasonable unless the Government satisfies its burden of establishing that one of the exceptions to the warrant requirement applies.[23] In *Terry v. Ohio*,[24] the Supreme Court created one such exception. Under *Terry*, police may "conduct a brief investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot."[25] However, in order to lawfully detain someone under *Terry* – even briefly – the Government must establish by a preponderance of the evidence that "each individual act constituting a search or seizure" was reasonable. More specifically, each aspect of the detention must be justified by a reasonable suspicion.[26]

As we noted at the outset, Bey argues that the district court erred in finding that the officers had reasonable suspicion

---

[20] U.S. CONST. amend. IV.

[21] *United States v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006).

[22] *Id.* (citing *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002)).

[23] *See California v. Acevedo*, 500 U.S. 565, 580 (1991) ("It remains a cardinal principle that searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment-subject only to a few specifically established and well-delineated exceptions.") (internal quotations omitted).

[24] 392 U.S. 1 (1968).

[25] *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).

[26] *United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005) ("On a motion to suppress, the government bears the burden of showing that each individual act constituting a search or seizure under the Fourth Amendment was reasonable."); *see also United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence.").

to seize him under *Terry v. Ohio*.[27] We determine if police had reasonable suspicion by considering the totality of the circumstances.[28] This standard requires us to credit reasonable deductions drawn by police in light of their experience and training.[29] However, reasonable suspicion unequivocally demands that the detaining officers must have a particularized and objective basis for suspecting the particular person stopped for criminal activity.[30] The ultimate question is whether the record is sufficient to establish that police had a reasonable suspicion based on articulated facts that would justify the search or seizure of the individual in question.[31]

The record here is sufficient to establish by a preponderance of the evidence that officers had reasonable suspicion to initially stop Bey. However, the Government failed to produce sufficient evidence to justify his continued detention once he turned around and they could compare him to the description of Robinson that had just been broadcast.

**A.**

Bey argues that the broadcast description of Robinson was so excessively general that it could not support reasonable suspicion and the district court's contrary conclusion is inconsistent with our opinion in *United States v. Brown*.[32]

In *Brown*, we invalidated a purported *Terry* stop that was based *only* on a generalized description of the suspect. There, police were given a description of two suspects who allegedly attempted a robbery.[33] The victim identified the

---

[27] 392 U.S. at 30 (holding that an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, "articulable suspicion" that criminal activity is afoot).

[28] *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

[29] *Id*.

[30] *See United States v. Cortez*, 449 U.S. 411, 417–18 (1981).

[31] *See Johnson v. Campbell*, 332 F.3d 199, 206 (3d Cir. 2003).

[32] 448 F.3d 239 (3d Cir. 2006).

[33] *Id*. at 241–42.

suspects as two African American males between fifteen and twenty years of age, wearing dark, hooded sweatshirts and running south on 22nd street.[34]  One male was described as 5'8" and the other as 6'0".[35]  On the basis of this description, police stopped and frisked two men: both African American males, both approximately the same height as the suspects.[36] The men who were stopped and frisked, however, were twenty-seven years old and thirty-one years old, and both had full beards.[37]  In holding that the defendants' seizure went beyond the limitations of *Terry*, we explained that the description was so "wildly wide of target" compared to the appearance of the two men who were detained that it was not reasonable under *Terry* to stop them.[38]  We explained, "even the less stringent standard of reasonable suspicion cannot be met by a description that paints with this broad a brush."[39]  We concluded that "[b]y no logic does [this description], by itself, support reasonable suspicion."[40]

The situation here is different.  When these officers approached Bey, they could see that he was an African American man wearing clothing similar to that worn by the fleeing suspect and he was where police expected to find that suspect.  Officers could not see Bey's face when they initially detained him.  The totality of the circumstances, including Bey's temporal and physical proximity to the traffic stop, the description of Robinson's clothing, the direction of Robinson's flight, the officers' familiarity with the neighborhood and their belief that the fleeing suspect may have tried to blend in at Lid's Café, coalesce to justify the police officers' initial approach to investigate Bey.  Police also had reason to suspect that the person they were looking for was armed.  Accordingly, police were justified in drawing their guns and ordering Bey to raise his hands and turn around.  However, the validity of the initial *Terry* stop does not end our inquiry.

---

[34] *Id*.

[35] *Id*.

[36] *Id*. at 242.

[37] *Id*.

[38] *Id*. at 248.

[39] *Id*. at 248.

[40] *Id*.

11

## B.

Bey argues that he, unlike Robinson, had a long beard, is more than a decade older than Robinson, much heavier, and significantly darker. Moreover, he did not appear to be sweating or short of breath. Therefore, nothing suggested that he had just run a block from pursuing police officers. Bey asserts that these factors would have dissipated the officers' reasonable suspicion when he turned, and they saw his face. We agree.

The brief investigative stop allowed under *Terry*, is just that; a brief stop to allow police to investigate.[41] The initial stop does not justify an arrest, prolonged detention, or a stop that lasts any longer than is reasonably necessary to investigate. As the Supreme Court has explained: "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop."[42] Moreover, "[i]t is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope *and duration* to satisfy the conditions of an investigative seizure."[43] "Once reasonable suspicion has been dispelled, even a very brief extension of detention without consent or reasonable suspicion violates the Fourth Amendment."[44] An investigative stop must therefore cease once reasonable suspicion dissipates.[45] "[W]ithout

---

[41] *See Wardlow*, 528 U.S. at 123 ("[A]n officer may, consistent with the Fourth Amendment, conduct a *brief*, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.") (emphasis added).

[42] *Florida v. Royer*, 460 U.S. 491, 500 (1983).

[43] *Id*. (emphasis added).

[44] *United States v. De La Cruz*, 703 F.3d 1193, 1197 (10th Cir. 2013) (internal quotations omitted); *see also United States v. Davis*, 430 F.3d 345, 357 (6th Cir. 2005) ("The Fourth Amendment allows police to detain a suspect on reasonable suspicion only for as long as it takes for the police to test the validity of their suspicions.").

[45] *See, e.g., United States v. Babwah*, 972 F.2d 30, 34 (2d Cir. 1992) (holding that agents' continued detention of suspect

additional reasonable suspicion, [an] officer must allow the seized person to depart once the purpose of the stop has concluded."[46]  We have stressed that, "[i]t is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure."[47]  The Government must satisfy that burden by a preponderance of the evidence.[48]

For the reasons that we explained in part A, the district court correctly concluded that "[t]he initial stop of Bey was justified . . . . When Powell and Cherry seized Bey, they had reasonable suspicion to believe that he [may have been] Robinson."[49]  But the seizure should have terminated once that suspicion was no longer reasonable.[50]  Thus, once Bey turned around, officers should have noticed the clear differences in appearance and age between the two men.

The district court did appreciate the extent to which Bey's appearance differed from the description of Robinson that had been broadcast.  The court explained:

> [the] photograph of Robinson that was entered into evidence revealed that Robinson is a light-skinned black male of youthful appearance, with a tattoo covering the front of his neck, a short moustache, narrow sideburns, and a small amount of facial hair underneath his chin.[51]

---

became illegal once their reasonable suspicion proved unfounded).

[46] *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015).

[47] *See Royer*, 460 U.S. at 500.

[48] *Matlock*, 415 U.S. at 177 n.14 ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence.").

[49] *Bey*, 2017 WL 875364, at *11.

[50] *See Rodriguez*, 135 S. Ct. at 1614 ("[W]ithout additional reasonable suspicion, [an] officer must allow the seized person to depart once the purpose of the stop has concluded.").

[51] *Bey*, 2017 WL 875364, at *3.

The court discounted the apparent differences between Bey and Robinson, however, because the Government's photograph of Robinson was not the MDT image that officers saw that night, but rather a photograph taken six months later. The court therefore concluded that it "c[ould not] evaluate the differences between the photograph that Powell saw of Robinson and what Bey looked like when [Powell] saw him exiting Lid's [Café]."[52] Consequently, the court held that "the probative value of the photograph was questionable,"[53] and apparently concluded that Bey had therefore failed to prove that reasonable suspicion did not continue after he turned around. However, that conclusion punished Bey for the Government's failure to introduce the MDT image that police viewed at the time of the incident.

The court's analysis required Bey to prove that his appearance was not reasonably close to Robinson's the night of the incident. However, it was the Government's burden to prove that Bey did sufficiently resemble Robinson to justify the continued detention, and the Government had to do so by a preponderance of the evidence.[54] Based on the available evidence – the photograph that the government did submit – the differences between the two men are as obvious as they are significant.[55] For reasons known only to the Government, Robinson's MDT image was not introduced, but Bey cannot be prejudiced by the Government's failure of proof.

We explained how a similar discrepancy between description and actual appearance fatally undermined reasonable suspicion to conduct a *Terry* stop in *Brown.* There

---

[52] *Id.* at *11.

[53] *Id.*

[54] *See Ritter*, 416 F.3d at 261. ("On a motion to suppress, the government bears the burden of showing that each individual act constituting a search or seizure under the Fourth Amendment was reasonable.").

[55] In addition, reasonable suspicion is also undermined by the district court's finding that "Bey did not appear to be out of breath" when police saw him and approached him mere minutes after he would have had to have sprinted away from Officer Fritz if he were Robinson. *Bey*, 2017 WL 875364, at *4.

14

we noted the generic nature of the description that was broadcast for two robbery suspects and compared it to the appearance of Brown and his codefendant when police stopped them pursuant to *Terry*. We explained:

> [T]he match of [the defendants] to even [the] most general of descriptions was hardly close. Among other things, the robbery suspects were described as between 15 and 20 years of age, but on the date of the stop Brown was 28 years old and Smith was 31 years old. Moreover, both Brown and Smith had full beards and the description of the suspects included no mention of any facial hair. Indeed, about the only thing Brown and Smith had in common with the suspects was that they were [B]lack. What we have is a description that, while general, is wildly wide of target. By no logic does it, by itself, support reasonable suspicion.[56]

Once Bey turned around and police had a good look at his face and features, the situation here was analogous to the situation in *Brown.*

Bey's continued detention once he turned around is also analogous to the circumstances analyzed by the Court of Appeals for the Second Circuit in *United States v. Watson.*[57] There, two officers were searching for a man named Chauncy Butler.[58] The officers had a description of Butler and a photograph of Butler from a previous arrest.[59] Butler was described as a nineteen year-old black male; 5'10" to 6'0" tall; black hair; 155 to 180 pounds.[60] While searching for Butler, the officers spotted the defendant, Watson.[61] Watson was then twenty-five years old, 6'2" tall, and weighed 180 pounds.[62] The officers stopped and frisked Watson, based on his

---

[56] *Brown*, 448 F.3d at 248.
[57] 787 F.3d 101 (2d Cir. 2015).
[58] *Id.* at 102.
[59] *Id.* at 103.
[60] *Id.*
[61] *Id.*
[62] *Id.*

purported resemblance to the actual suspect.[63]  There, as here, the police recovered a gun during that search.[64]  Watson moved to suppress, arguing that no reasonable officer could have continued to believe he was Butler after getting a good look at him (Watson).[65]  The district court agreed with Watson, finding that as was "evident from a comparison of the photographs" of the two men, "Butler and Watson do not look [a]like."[66]  The district court held that the differences in the men's age, skin tone, weight and facial features were clear:

> In addition to their different facial features, skin tone, height, and weight, Watson is over five years older than Butler. Vaccaro's generic description of the similarities between Watson and Butler undermines the contention that he reasonably believed them to be the same person.[67]

On appeal, the Court of Appeals for the Second Circuit agreed.  The court held that "the search of Watson was objectively unreasonable" because "a reasonable officer, once he had had a chance to view Watson up close, could not have reasonably believed he was Butler."[68]  The court held that the "material differences [between the men] would have been apparent to any reasonable officer[.]"[69]

Here, the distinction between Robinson and Bey is even more pronounced because there is a greater age disparity in addition to the other differences in skin tone, facial hair, height and weight.  Because officers recovered the gun after they had a good look at Bey and should have known that he was not Robinson, the district court should have granted the motion to suppress.  To the extent that the MDT image police had of Robinson may have more closely resembled Bey than the image the Government introduced at the suppression hearing,

---

[63] *Id*. at 103–04.

[64] *Id*.

[65] *Id*. at 102–04.

[66] *Id*. at 104.

[67] *Id*.

[68] *Id*. at 105.

[69] *Id*.

the Government's failure to produce that image fatally undermines its attempt to prove that the police acted reasonably in detaining Bey after they had a good look at him. The two men "simply do not look [a]like."[70]

### III. CONCLUSION.

For the foregoing reasons, we will reverse the district court's denial of Bey's motion to suppress and vacate the judgment of conviction.

---

[70] *Id.*