**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2122-17T3

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

TYRESE BUTLER, a/k/a
JACQUAN BUTLER, JACQUAN
R. BUTLER, JAQUAN BUTLER,
TYRICE BUTLER, TYRICE L.
BUTLER, TYRICE R. BUTLER,
TYRECE BUTLER, and TYRESE
BUTLER,

     Defendant-Appellant.

_____

Submitted December 9, 2019 – Decided September 16, 2020

Before Judges Ostrer and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 16-04-0305.

Joseph E. Krakora, Public Defender, attorney for appellant (Alicia J. Hubbard, Assistant Deputy Public Defender, of counsel and on the brief).

Lyndsay V. Ruotolo, Acting Union County Prosecutor, attorney for respondent (Timothy M. Ortolani, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Because defendant is short and the attempted burglar police sought was said to be tall, defendant contends he was seized unlawfully, and the drugs he possessed should have been suppressed. We are unconvinced. The totality of circumstances determines if police have a reasonable and articulable suspicion to conduct an investigative detention. A mismatched descriptor is just one circumstance. Its significance depends on how the remaining, matching descriptors distinguish the perpetrator from the general population and how the mismatch tends to exclude the defendant as a suspect. A court must also consider the probability the victim made a mistake, or the suspect altered his appearance. And, the court must weigh circumstances, apart from the description, tending to create reasonable and articulable suspicion. Viewing the totality of such circumstances in this case, we conclude the police lawfully seized defendant.

I.

One January morning in Elizabeth, a woman told a 911 dispatcher that a tall black man wearing dark pants, a puffy jacket, and a hood, was trying to gain

A-2122-17T3

entry to her house. Informed of the report, two uniformed police officers in a marked patrol car spotted defendant a short time later walking on the otherwise empty street opposite the victim's house. A black male, defendant was wearing dark pants, a black puffy jacket, and a hood. But, he is not tall.

Before the officers exited their vehicle, defendant immediately ran off while putting his hands in his pockets. Police then chased, and one officer ordered him to stop and get on the ground. Defendant ignored the command and as he ran he twice discarded what turned out to be packages of drugs. The officers soon caught defendant. As he resisted, defendant tried again to empty his pockets. Once police subdued defendant, they found more drugs under his thigh.

The victim told police that the man who tried to enter her house was taller than defendant. Police did not charge defendant with the attempted burglary, but they did charge him with multiple drug-related crimes and resisting arrest.

After indictment, defendant moved to suppress the drugs the police seized. At the suppression hearing, an arresting officer — the sole witness — recounted the facts we have described. He said he pursued defendant because "he matched the description" of the attempted burglar. The officer acknowledged defendant was not tall, as he stood in the courtroom. The officer recalled that defendant

was just ten feet away when the officers started to chase him, but "in that instant" when defendant took off, the officer said he could not discern defendant's height.

The officer did not expressly say that defendant began to run before police ordered him to stop. He stated that once police noticed defendant, "immediately we stopped and he began to run." Asked on cross-examination if he ordered defendant to stop "as soon as [he] saw" defendant, the officer did not respond directly, stating, "We got out of the car and he started running. . . . Well, he actually started running before we got out of the car."

The officer could not say how long it took to arrive on the victim's block. Pressed, he said it was possible that five minutes elapsed. Notably, the victim was still on the phone with the dispatcher when the police arrived.

Defendant argued the stop was unreasonable because he did not match the attempted burglar's reported height.

The court denied the motion. The court acknowledged that the dispatcher reported the suspect was tall, and defendant was not. Nonetheless, the court found that the officers had reasonable suspicion to detain defendant. The circumstances supporting that finding were: he "match[ed]" the victim's description of the suspect; he was just "a few homes away" from the victim's house; no one else was on the street; and defendant started to run after he noticed

4

the police vehicle.[1]  The judge found the seizure of the drugs was not unlawful because the drugs were abandoned while defendant ran, and were lawfully seized incident to a lawful arrest for drug possession and resisting.

Defendant then pleaded guilty to possessing drugs with the intent to distribute them in a school zone, N.J.S.A. 2C:35-7.  Consistent with his plea agreement, the court sentenced him to a five-year term, with thirty months of parole ineligibility.

On appeal, defendant presents the following point for our consideration:

> EVEN THOUGH THEY WERE RESPONDING TO AN EARLIER CALL OF AN ATTEMPTED BREAK-IN BY A TALL BLACK MAN, WHEN POLICE SAW MR. BUTLER, A SHORT BLACK MAN, WALKING DOWN THE OTHER SIDE OF THE STREET, THEY ORDERED HIM TO STOP THEN CHASED HIM THROUGH THE RESIDENTIAL NEIGHBORHOOD. THAT MR. BUTLER WAS WEARING TYPICAL WINTER CLOTHES ON A WINTER DAY AND THE

---

[1]  The judge did not clearly decide whether defendant ran before the officer commanded him to stop.  Recalling the officer's testimony, the judge wrote, "He testified that police yelled for the person to stop and put his hands up.  He testified that the suspect began to run away and that he gave chase."  Addressing defendant's argument, the judge also wrote, "The officers tried to initiate a stop, but the individual allegedly fled."  Although these three sentences suggest a finding that defendant ran after police commanded him to stop, the judge also suggested a finding that defendant ran before the command to stop, writing that "[a]fter noticing the police vehicle, the suspect immediately started to run," and "when the individual saw the officers, and before the officers were able to detain him, he immediately fled on foot."

A-2122-17T3

BREAK-IN SUSPECT WAS WEARING GENERIC WINTER CLOTHES AND WAS ALSO A BLACK MAN, DID NOT PROVIDE POLICE WITH REASONABLE SUSPICION THAT HE WAS INVOLVED IN ANY CRIME. THEREFORE, THE FRUITS OF THE ENCOUNTER MUST BE SUPPRESSED. U.S. CONST. AMENDS. IV AND XIV; N.J. CONST. ART. I, PAR. 7.

Essentially, defendant contends the difference between his height and the attempted burglar's was more significant that his match of other descriptors.[2] Defendant also highlights that the police did not recognize him from prior encounters, nor did they observe him engage in unlawful or suspicious behavior.

II.

The following observations are not controversial. Police seized defendant when they gave chase, commanding him to stop and get on the ground. See State v. Tucker, 136 N.J. 158, 166 (1994) (although the record did not disclose if police commanded defendant to stop running, foot-chase of defendant constituted seizure, since "a reasonable person [would] believe that the police wanted to capture him and not just . . . speak with him"). If the stop of defendant was lawful, so was the seizure of the drugs defendant discarded as he ran. See

---

[2]  Defendant argues on appeal that he is five-feet five-inches tall. But, he introduced no competent evidence of his precise height at the suppression hearing.

A-2122-17T3

State v. Ramos, 282 N.J. Super. 19, 22-23 (App. Div. 1995) (denying suppression of drugs discarded during lawful investigative stop); State v. Farinich, 179 N.J. Super. 1, 6-7 (App. Div. 1981) (holding lawfully stopped suspect abandoned suitcase when he dropped it and fled), aff'd o.b., 89 N.J. 378 (1982); cf. Tucker, 136 N.J. at 172 (suppressing drugs discarded during unlawful seizure of fleeing defendant). And, as defendant's refusal to obey while discarding various items created probable cause to arrest, see State v. Williams, 192 N.J. 1, 11 (2007) (stating a person commits the crime of obstruction by fleeing from an investigatory stop), the police were authorized to seize the drugs under defendant's thigh, see State v. Pena-Flores, 198 N.J. 6, 19 (2009) (stating that "[u]nder the search incident to arrest exception, the legal seizure of the arrestee automatically justifies the warrantless search of his person and the area within his immediate grasp"), overruled on other grounds, State v. Witt, 223 N.J. 409, 450 (2015).

The question is whether the stop was authorized. "[I]f police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a Terry[3] stop may be made to investigate that suspicion." United

---

[3] Terry v. Ohio, 392 U.S. 1 (1968).

States v. Hensley, 469 U.S. 221, 229 (1985). The police may rely on their training and experience, and "rational inferences" from the facts before them. See Terry, 392 U.S. at 21; State v. Arthur, 149 N.J. 1, 8 (1997). "Reasonable suspicion is less than proof . . . by a preponderance of evidence, and less demanding than that for probable cause, but must be something greater than an inchoate or unparticularized suspicion or hunch." State v. Barrow, 408 N.J. Super. 509, 517 (App. Div. 2009) (internal quotation marks omitted) (citing United States v. Sokolow, 490 U.S. 1, 7 (1989)). "[T]he bar is low, [but] it is a bar nonetheless." State v. Atwood, 232 N.J. 433, 448 (2018).

In determining whether reasonable and articulable suspicion supports an investigative detention, a court must consider the "totality of the circumstances." State v. Pineiro, 181 N.J. 13, 22 (2004). The "totality of the circumstances" may justify an investigative detention although each fact, standing alone, would not. Id. at 25. Also, an officer may rely on facts "'consistent with guilt,'" even if "'purely innocent connotations can be ascribed'" to them. State v. Citarella, 154 N.J. 272, 279-80 (1998) (quoting State v. Arthur, 149 N.J. 1, 11 (1997)).

An officer may generally assume a crime victim's veracity and reliability in describing a suspect. See State v. Amelio, 197 N.J. 207, 212-13 (2008). When a crime victim gives a reasonably detailed description of a criminal, police

will usually have a reasonable and articulable suspicion to stop a person who matches the description. See, e.g. State ex rel. H.B., 75 N.J. 243, 248 (1977) (sustaining Terry frisk of person who matched anonymous tipster's "precisely accurate" description of "black individual wearing a black hat, black leather coat and checkered pants" in a particular restaurant); see also United States v. Brown, 448 F.3d 239, 247 (3d Cir. 2006) (stating "[t]he fact that 'every detail provided [in a description] matched the details observed by the officers' can contribute to a finding of reasonable suspicion" (quoting United States v. Nelson, 284 F.3d 472, 483 (3d Cir. 2002))).

However, police may not rely solely on a "generic description" that does little to distinguish a suspect from the general population. See State v. Shaw, 213 N.J. 398, 411, 421 (2012) (stating "[a] random stop based on nothing more than a non-particularized racial description of the person sought is especially subject to abuse"). See also Brown, 448 F.3d at 247-48; In re T.L.L., 729 A.2d 334, 340 (D.C. 1999) (stating that description of two black teenagers, one with a dark complexion and one with a medium complexion "could have fit many if not most young black men" and was insufficient to justify investigative stop); United States v. Turner, 699 A.2d 1125, 1128-29 (D.C. 1997) (stating that "a

9

description applicable to large numbers of people will not suffice to justify the seizure of an individual").

In this case, the clothing the victim described was not especially distinctive for January, but the combination of a puffy jacket, as opposed to a slim one, plus a hoody, and dark pants, did narrow the universe of possible suspects. Identifying the attempted burglar's race and height further limited possible suspects, although Elizabeth has a significant black population, and "tall" is subject to interpretation.[4] Yet, we need not decide whether the description in this case adequately distinguished the perpetrator from the general population, and provided reasonable and articulable suspicion to detain someone who matched the description. Defendant did not perfectly match the victim's description.

"The fact that a part of the description does not fit is . . . obviously a negative factor." Brown v. United States, 590 A.2d 1008, 1018 (D.C. 1991). For example, the Third Circuit held police lacked reasonable suspicion to stop two bearded black men, twenty-eight and thirty-one years old, when the suspects

---

[4] Almost twenty percent of Elizabeth's population is "Black or African American alone." See U.S. Census Bureau, Quick Facts: Elizabeth, New Jersey, https://www.census.gov/quickfacts/elizabethcitynewjersey. The record does not say if the racial makeup of the victim's neighborhood varied from that, one way or the other.

A-2122-17T3

were said to be between fifteen and twenty, and the description did not mention facial hair. Brown, 448 F.3d at 248. Even if a partial match justifies a stop, an officer may be obliged to terminate the stop once a mismatch appears. See United States v. Bey, 911 F.3d 139, 146 (3d Cir. 2018) (holding it was reasonable for officers to approach defendant from the back as his clothes matched suspect's description, but they should have ceased the encounter once they turned him around and realized his facial features and age were not a match).

But, "[n]ot every discrepancy is fatal." Brown, 590 A.2d at 1018. "[A]n imperfect match between a suspect and a description does not necessarily make an officer's suspicion unreasonable." Torry v. City of Chicago, 932 F.3d 579, 588 (7th Cir. 2019). See also State v. Kyles, 607 A.2d 355, 368 (Conn. 1992) (stating that "[t]he police . . . are not required to confirm every description of the perpetrator that is broadcast over the radio"). As Professor LaFave has observed, officers "must be allowed" to consider that the victim or witness got a descriptive factor wrong, or that "a change of circumstances or efforts at concealment" rendered the factor inapplicable. 4 LaFave, Search & Seizure § 9.5(h) (5th ed. 2019). "What must be taken into account is the strength of those points of comparison which do match up and whether the nature of the

descriptive factors which do not match is such that an error as to them is not improbable." 4 LaFave, Search & Seizure § 9.5(h) (5th ed. 2019).

While a partial match may still arouse suspicion, a particular mismatch may tend to exclude a person as a suspect more than the matching factors tend to include him. One may imagine a suspect described as white, in blue jeans and a hoody, medium height and build, with a large scar on his forehead. The scar is the most distinctive characteristic. An officer would obviously have a weaker basis to stop someone without the scar, than someone without the hoody. Indeed, if the victim had not observed the perpetrator's face, the scar-less person would be subject to greater suspicion than if the victim had.

Considering the totality of circumstances, police must also be able to consider factors apart from the imperfectly matched description that tend to support or undermine reasonable suspicion. In State v. Privott, 203 N.J. 16, 21 (2010), police stopped a man who imperfectly matched a caller's description of a man with a gun. Like the person described, he was tall, thin, dark-skinned and wore a black and red cap. But, his jacket was red, not black as the caller described. Notwithstanding that mismatched descriptor, the Court held the stop was reasonable. The Court noted the defendant "partially matched the description given"; the officer knew the defendant had been arrested before and

12

was involved in gangs; and, as the officer approached, the defendant appeared nervous, and began to walk away while moving one hand toward his waistband, where weapons are commonly concealed. Id. at 28-29.

In this case, we must consider the power of remaining, matching descriptors to distinguish defendant from the general population; the power of the height discrepancy to exclude defendant as a suspect; the possibility the victim made a mistake about the mismatched descriptor; and circumstances apart from the description tending to create reasonable and articulable suspicion.[5]

Defendant's matching clothing, race and sex were significant, if not sufficient factors, to justify the investigative detention. As we have noted, although each item of clothing was not especially distinctive, in combination they served to distinguish defendant from others. The arresting officer testified that he did not have a chance to determine if defendant was tall, before he started running. So, from the officer's perspective, height was a non-factor, as opposed to an excluding factor. The trial judge made no finding whether the officer was credible on that point. But see United States v. Watson, 787 F.3d 101, 105 (2d Cir. 2015) ("A material difference in . . . height is not something that takes a

---

[5] Since height is not easily hidden and changes very slowly, we do not consider the possibility of concealment or a change of circumstances.

A-2122-17T3

long time to process"). Yet, even assuming the officer noticed upon his approach, or while in pursuit, that defendant was not tall, the victim may have been mistaken in her description. A person may view another's height relative to one's own. An assessment of height may be affected by one's angle or sight. In any event, the general description that the perpetrator was tall was not so distinctive that defendant's less-than-tall stature was enough to quell reasonable suspicion.

The totality of other circumstances engendered reasonable and articulable suspicion that defendant was the attempted burglar. Temporal and spatial proximity both supported reasonable suspicion. See United States v. Goodrich, 450 F.3d 552, 562 (3d Cir. 2006) (holding that "geographical and temporal proximity . . . to the scene of the reported theft" supported reasonable suspicion); State v. Reynolds, 124 N.J. 559, 569 (1991) (affirming finding that "defendant's proximity to the crime in both time and space and that his similarity to the general description of the suspect were sufficient to generate a reasonable suspicion"). Defendant was found across the street from the victim's home. He was the only person on the street in the middle of the morning. It may have taken the officer five minutes to arrive. He said that was possible. But, the victim was still on the phone with the dispatcher, indicating not much time had

passed. There was also no evidence that the attempted burglar was on the run, which would have made it unlikely he would still be so close to the victim's home after five minutes. The partial match, along with the temporal and spatial proximity, established reasonable and articulable suspicion to conduct an investigatory stop.

Even if that were not enough, defendant also fled from the officers. If he did so before the officers commanded him to stop, then such flight provided an additional element, as part of the totality of circumstances, justifying the initial command to stop. We recognize that "flight alone does not create reasonable suspicion for a stop." State v. Dangerfield, 171 N.J. 446, 457 (2002). However, it may support reasonable and articulable suspicion "in combination with other circumstances." Pineiro, 181 N.J. at 26. Applying that principle, we held in State v. Ruiz, 286 N.J. Super. 155, 163 (App. Div. 1995), that police had reasonable and articulable suspicion to stop suspect based on his flight from police and other factors.[6]

---

[6] One might argue that defendant's refusal to stop constituted an intervening act of obstruction, authorizing police to arrest him for that offense and to seize evidence incident thereto. See State v. Williams, 192 N.J. 1, 16 (2007) (stating that "[c]ourts of this State have held that eluding the police and resisting arrest in response to an unconstitutional stop . . . constitute intervening acts and that evidence seized incident to those intervening criminal acts will not be subject to

A-2122-17T3

In sum, based on the totality of circumstances, police stopped defendant lawfully, because they had reasonable and articulable suspicion that defendant was the attempted burglar the victim described. The fact that the attempted burglar was tall, and defendant was not, was not enough to quell the reasonable and articulable suspicion that the other factors created. The trial court properly denied defendant's motion to suppress.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

suppression"); State v. Crawley, 187 N.J. 440, 458 (2006) (stating "a person has no constitutional right to endanger the lives of the police . . . by fleeing or resisting a stop, even though a judge may later determine the stop was unsupported by reasonable and articulable suspicion"). However, as the State does not rely on Williams and Crawley, we do not address the argument.