# IN THE COURT OF APPEALS OF IOWA

No. 21-0625
Filed June 15, 2022

**STATE OF IOWA,**
Plaintiff-Appellee,

**vs.**

**JESSICA JOANN MARIE VERSTEEGH,**
Defendant-Appellant.

_____

Appeal from the Iowa District Court for Polk County, Jeffrey Farrell, Judge.

Jessica Versteegh appeals the denial of her motion to suppress evidence from a stop and frisk. **AFFIRMED.**

Martha J. Lucey, State Appellate Defender, and Rachel C. Regenold, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Louis S. Sloven, Assistant Attorney General, for appellee.

Heard by Bower, C.J., and Schumacher and Ahlers, JJ.

**AHLERS, Judge.**

Jessica Versteegh was convicted of carrying a dangerous weapon. Prior to trial, the district court denied Versteegh's motion to suppress evidence from a stop and frisk. Versteegh appeals, arguing the court erred in denying her motion to suppress. We find reasonable suspicion to justify the investigatory stop and resulting frisk. Therefore, we affirm Versteegh's conviction.

## I. Background Facts and Proceedings.

At 11:49 p.m. on Sunday, August 9, 2020, staff from a local university notified Des Moines police about shots fired on campus at approximately 26th Street and Forest Avenue. Officers began arriving around 12:08 a.m., and they quickly located and detained multiple suspects. Based on information from university staff and the suspects already detained, officers believed the suspects they were looking for included six black males between fourteen and sixteen years old.

Sergeant Garth House was one of the officers participating in the search. After inspecting the scene of the shooting, Sergeant House began searching for suspects from his patrol vehicle and on foot. Sergeant House believed at least one at-large suspect still possessed a firearm used in the shooting. At one point, another officer reported over the police radio that "a passerby said a female in a—wearing blue and khaki—blue top, khaki bottoms, about 28th and [University]," and the dispatcher replied "we've had that description a couple of times." At about the same time, Sergeant House drove past a pedestrian wearing a blue shirt and khaki shorts walking eastbound along University Avenue near 25th Street. Even though Sergeant House initially thought the pedestrian was male, he stopped and exited

his vehicle to speak with the pedestrian, later identified as Versteegh. Sergeant House's body camera recorded the encounter. Sergeant House testified he realized Versteegh was female as soon as she spoke. The two had the following interaction:

> House: Hi. Where you coming from?
> Versteegh: Walking down from [a nearby restaurant], pretty much.
> House: Okay, well, we had a deal up there by [the university], okay? Matching your description pretty well—
> Versteegh: What?
> House: —clothing anyways.
> Versteegh: Really?
> House: Yes. You got an ID on you?
> Versteegh: No, but I have my name.
> [House talking on his radio]
> Versteegh: Somebody just passed by me and was like, "are you in trouble?" I was like, "no." But I was like, I think you've been passing me actually.
> House: Uh, I just drove by here and turned around.
> Versteegh: I was actually walking from [the restaurant] going to 23rd [Street] to my friend's house.
> House: Okay, hang on a second.
> [House talking on his radio]
> Versteegh: What happened down there?
> [House talking on his radio]
> House: Somebody shot [a firearm on campus]. You don't got a weapon or anything do you right now?
> Versteegh: Oh, wow, really? No.
> House: Okay, I'm just going to pat you down real quick, make sure you don't have any weapons, okay?

Sergeant House grabbed Versteegh's left arm to frisk her, which he testified he does to prevent the subject from running away or assaulting him if the suspect has contraband. Versteegh hesitated and then admitted she had a handgun in her pants pocket. Sergeant House detained Versteegh in handcuffs, secured the handgun, and arrested her for unlawfully carrying a firearm. Although Versteegh

was initially a suspect in the shooting, upon completion of the investigation, the State does not allege that Versteegh was involved in it.

Versteegh filed a motion to suppress evidence from the search, claiming the State lacked reasonable suspicion to justify the stop and frisk. After a hearing, the district court denied the motion. Following a trial on the minutes, the court found Versteegh guilty of carrying a weapon.[1] The court sentenced Versteegh to a term of incarceration not to exceed two years for the carrying-weapons charge, ordered the sentence to be served consecutively to her sentences in two unrelated matters, and suspended the sentence. Versteegh appeals.

## II.     Standard of Review

Versteegh argues that the investigatory stop and the subsequent frisk were an unreasonable seizure and search in violation of the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution. While Versteegh raises the issue under both constitutions, she does not put forth an independent standard to evaluate her claims under the Iowa Constitution. Therefore, "we will apply the general standards as outlined by the United States Supreme Court for addressing a search and seizure under the Iowa Constitution."[2] "We review claims challenging the denial of a motion to suppress evidence on constitutional grounds de novo."[3] "When presented with such claims, we make an 'independent evaluation of the totality of the circumstances as shown by the entire

---

[1] *See* Iowa Code § 724.4(1) (2020).
[2] *State v. Tyler*, 830 N.W.2d 288, 292 (Iowa 2013).
[3] *State v. Stevens*, 970 N.W.2d 598, 601 (Iowa 2022).

record.'"[4] "We give deference to the district court's factual findings, but they do not bind us."[5]

## III. Analysis

A warrantless search and seizure is per se unconstitutional unless an exception applies.[6] "One exception to the warrant requirement allows an officer to stop an individual or vehicle for investigatory purposes based on a reasonable suspicion that a criminal act has occurred or is occurring."[7] "The purpose of an investigatory stop is to allow a police officer to confirm or dispel suspicions of criminal activity through reasonable questioning."[8] "To justify an investigatory stop, the officer must be able to point to 'specific and articulable facts, which taken together with rational inferences from those facts, reasonably warrant that intrusion.'"[9] "Whether reasonable suspicion exists for an investigatory stop must be determined in light of the totality of the circumstances confronting a police officer, including all information available to the officer at the time the decision to stop is made."[10] "An officer may make an investigatory stop with 'considerably less than proof of wrongdoing by a preponderance of the evidence.'"[11] "Factors that may reasonably lead an experienced officer to investigate include time of day or night, location of the suspect parties, and the parties' behavior when they become

---

[4] *Stevens*, 970 N.W.2d at 602 (quoting *State v. Scheffert*, 910 N.W.2d 577, 581 (Iowa 2018)).

[5] *Stevens*, 970 N.W.2d at 602 (quoting *Scheffert*, 910 N.W.2d at 581).

[6] *State v. Kreps*, 650 N.W.2d 636, 641 (Iowa 2002).

[7] *Kreps*, 650 N.W.2d at 641.

[8] *Kreps*, 650 N.W.2d at 641.

[9] *Kreps*, 650 N.W.2d at 641 (citation omitted).

[10] *Kreps*, 650 N.W.2d at 642.

[11] *Kreps*, 650 N.W.2d at 642 (quoting *State v. Richardson*, 501 N.W.2d 495, 496–97 (Iowa 1993)).

aware of the officer's presence."[12]   "In addition, a person's temporal and geographic proximity to a crime scene, combined with a matching description of the suspect, can support a finding of reasonable suspicion."[13]

### A.    Investigatory Stop

While both parties agree that a stop occurred at some time, to some degree, they disagree as to when the stop began.  The event upon which this appeal focuses is the frisk, which, as explained below, must be supported by reasonable suspicion at the time independent of when the stop began.  As the State does not challenge that a stop occurred before the frisk began, we need not decide the precise moment that the stop occurred.  For purposes of our discussion, we will assume the investigatory stop began when Sergeant House exited his patrol vehicle and began speaking to Versteegh.

The State relies primarily on three factors as providing reasonable suspicion to justify the investigatory stop: Versteegh's temporal and geographic proximity to the shooting, the time and place of the stop, and Versteegh's appearance being similar to the description of the suspects.

For temporal and geographic proximity, the State points to a recent case from the District of Columbia, *Funderburk v. United States*, wherein the court "recognized that 'sometimes the universe' of potential suspects 'will be small enough that no description at all will be required to justify a stopping for

---

[12] *United States v. Quinn*, 812 F.3d 694, 697–98 (8th Cir. 2016) (quoting *United States v. Dawdy*, 46 F.3d 1427, 1429 (8th Cir. 1995)).
[13] *Quinn*, 812 F.3d at 698.

investigation.'"[14]  In *Funderburk*, the officers heard gunfire, narrowed the location of the gunfire to a twenty-five meter area, and encountered the defendant in that area about thirty seconds after the gunfire.[15]  We recognize this temporal and geographic proximity is much stronger than the proximity here.  Des Moines police responded to a call about gunfire rather than personally observing it.  While our record contains no definitive evidence of the precise time of the shooting, the evidence suggests that the shots were fired at least several minutes before officers arrived at the scene, but the suspects were still in the area and actively fleeing at the time Sergeant House encountered Versteegh.  Sergeant House testified he encountered Versteegh "[a]bout two blocks" away from the shooting, which is not a small area to search for suspects next to an urban college campus.  But a stop and frisk may be supported by reasonable suspicion even with much greater temporal and geographic distance when considered with the totality of the circumstances.[16]

For the time and place of the stop, the State notes Versteegh was the only person Sergeant House saw while searching for suspects.  Sergeant House testified "[t]here was literally no one else out" that night, not even other vehicles.

---

[14] 260 A.3d 652, 657 (D.C. 2021) (quoting *In re T.L.L.*, 729 A.2d 334, 341 (D.C. 1999)); *accord Quinn*, 812 F.3d at 698 ("[A] person's temporal and geographic proximity to a crime scene, combined with a matching description of the suspect, can [also] support a finding of reasonable suspicion.").

[15] 260 A.3d at 657; *see also Quinn*, 812 F.3d at 698 (finding reasonable suspicion to investigate when the suspect "was stopped within a few blocks of [the crime scene], roughly forty minutes after officers saw suspects flee," combined with other factors).

[16] *See, e.g., State v. Lamp*, 322 N.W.2d 48, 51 (Iowa 1982) (finding reasonable suspicion to stop a suspect encountered almost five hours and approximately five miles from the perpetration of the crime), *abrogated on other grounds by State v. Heminover*, 619 N.W.2d 353, 357 (Iowa 2000).

The body camera footage confirms the area was generally devoid of activity at the time of the encounter. Sergeant House testified that the reasons the area was deserted included the late hour on a weeknight (the shooting occurred late on Sunday evening, with events continuing to develop in the early morning hours of Monday), the ongoing COVID-19 pandemic, and the fact that the campus was closed at that time. Versteegh points out that the area could not have been completely deserted if another person alerted the police that she was in the area. She also attacks Sergeant House's credibility based on the "inconsistency" that he testified he saw no one else that night when, in fact, another passerby saw her walking that night. We see no inconsistency in Sergeant House not noticing the passerby who reported seeing Versteegh. Regardless, Sergeant House testified he did not see anyone else and, even if there were a few other people in the area who were uninvolved with the shooting, the universe of potential suspects at that time and place was small.[17]

As for the description of the suspects, officers were searching for six black males ages fourteen to sixteen.[18] Versteegh's brief describes Versteegh as a twenty-seven-year-old, white female. But Sergeant House testified Versteegh's

---

[17] *See Armstrong v. United States*, 164 A.3d 102, 110 (D.C. 2017) ("[W]hen looking at the totality of the circumstances, courts essentially weigh facts that contract the relevant universe of potential suspects against facts that expand it, in order to determine whether there is particularized reasonable suspicion in any one person.").

[18] The radio chatter included a report of a female matching Versteegh's clothing walking in the area, but Sergeant House testified he thought Versteegh was male when he stopped her. Thus, it is not clear if Sergeant House thought he was stopping the person described in the radio report when he stopped Versteegh. Regardless of the role the radio report played in the stop, the description of the suspects as black teenage males is an important factor in the reasonable suspicion justifying the stop.

appearance—slim build, baggy shorts, t-shirt, and hair pulled up in a manner frequently referred to as a "man bun"—was initially consistent with a teenage male's appearance from his initial vantage point. The basis for Sergeant House's confusion on Versteegh's identifying characteristics is confirmed by the body camera footage, which shows that Versteegh appeared somewhat dark complexioned and much younger than twenty-seven years of age, especially at night from a distance. Upon our review of the body camera video, we agree Versteegh's appearance at a distance was consistent with a black, teenage male, though the fact that she did not meet that description became clearer as Sergeant House got closer to her. Versteegh argues any reasonable suspicion based on her similarity in appearance to the description of the suspects dissipated as soon as Sergeant House realized she was not black, not male, and several years older than sixteen.[19] Even though closer contact with Versteegh revealed that she did not meet the description of the suspects in terms of gender, age, or race, we agree with the State's argument that, if Sergeant House was mistaken as to those characteristics from a distance at night, the people giving the description of the fleeing suspects could have just as easily been mistaken. Sergeant House was investigating a recent crime, and reasonable suspicion may exist even if the person being stopped does not exactly match a stated description of the suspect.[20] Furthermore, the stop occurred at a chaotic time when information was rapidly

---

[19] *See State v. Coleman*, 890 N.W.2d 284, 301 (Iowa 2017) ("[W]hen the reason for a traffic stop is resolved and there is no other basis for reasonable suspicion, . . . the driver must be allowed to go his or her way without further ado.").

[20] *See United States v. Slater*, 979 F.3d 626, 630–31 (8th Cir. 2020) (finding reasonable suspicion may exist to stop a person who matches a "general description" of the suspects).

changing. A shooting had just occurred, and Sergeant House believed that at least one firearm had yet to be recovered. Suspects were still fleeing after officers arrived, and frequent radio chatter was updating officers on the pursuit. Given these facts, reasonable suspicion based on Versteegh's initial similarity in appearance to the description of the suspects persisted, and Sergeant House was not required to release Versteegh simply because she did not ultimately match the suspects' description. So, when assessing the totality of the circumstances as they relate to the reasonableness of the stop, Sergeant House's discovery of any mistake as to those characteristics did not negate the reasonableness of his suspicion.

Versteegh's temporal and geographic proximity to the crime, the time and place of the stop, and Versteegh's similarity in appearance to the description of the suspects' appearance—when considered together as part of the totality of the circumstances—combine to present reasonable suspicion of criminal activity. Therefore, we find reasonable suspicion to justify the investigatory stop.

### B. Frisk

Even when an investigatory stop is supported by reasonable suspicion, a subsequent frisk must also be supported by "reasonable suspicion that 'criminal activity may be afoot' and 'reasonable suspicion that a person with whom [the officer is] dealing might be armed and presently dangerous.'"[21] "[A] frisk for weapons, which takes only a few seconds, is 'a serious intrusion upon the sanctity

---

[21] *Slater*, 979 F.3d at 630 (citations omitted).

of the person, which may inflict great indignity and arouse strong resentment.'"[22] An initially valid investigative stop "must . . . cease once reasonable suspicion dissipates."[23]

Versteegh argues reasonable suspicion dissipated before the frisk because officers were searching for six suspects and radio chatter showed officers located the sixth suspect soon after Sergeant House stopped her. However, it is not clear Sergeant House heard this chatter. Even if we assume Sergeant House knew other officers had located six suspects, no one had cancelled the search yet; no one had established that six and only six persons were involved in the shooting; and no one confirmed all six suspects already stopped were actually involved in the shooting. Thus, reasonable suspicion persisted even after stopping six other persons.

The State bolsters reasonable suspicion for the frisk by pointing to Sergeant House's observations during the investigation prior to the frisk. Sergeant House testified he was suspicious of Versteegh because she exhibited "nervous behaviors"; specifically she "was speaking very fast," "using a lot of gestures," and "very talkative."[24] The body camera video confirms this testimony. Nevertheless,

---

[22] *State v. Pals*, 805 N.W.2d 767, 775 (Iowa 2011) (quoting *Terry v. Ohio*, 392 U.S. 1, 17 (1968)).

[23] *United States v. Bey*, 911 F.3d 139, 147 (2d Cir. 2018); *accord Coleman*, 890 N.W.2d at 300 ("[R]easonable suspicion is constitutionally required before the officers may engage in a pat-down search.").

[24] Sergeant House also testified he was suspicious because Versteegh "turned her body away" from him, which is consistent with wanting to protect a weapon. But on cross-examination, Sergeant House acknowledged Versteegh did not turn away from him until he grabbed her arm to frisk her. Because Versteegh did not turn away from Sergeant House until the frisk, we do not consider this behavior as a factor supporting the frisk.

we recognize nervousness during an investigation is "of limited significance" because "it cannot be deemed unusual for a person to exhibit signs of nervousness when confronted by an officer."[25] So, while we give Versteegh's nervousness little weight, we do give it some consideration as part of the totality of the circumstances.

Versteegh also argues that, even if Sergeant House had reasonable suspicion to believe Versteegh was involved in the shooting, he did not have reasonable suspicion to believe she was armed and dangerous to justify the frisk.[26] However, Sergeant House was investigating a shooting and believed at least one firearm was still unrecovered. Having found reasonable suspicion Versteegh was involved in the shooting, we also find reasonable suspicion Versteegh was armed and dangerous.[27] Therefore, the frisk was also supported by reasonable suspicion.

---

[25] *See United States v. Guerrero*, 374 F.3d 584, 590 (8th Cir. 2004); *In re Pardee*, 872 N.W.2d 384, 394 (Iowa 2015) (stating many investigatory subjects "get nervous when [law enforcement] draws near").

[26] *See Arizona v. Johnson*, 555 U.S. 323, 326 (2009) ("[T]o proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous.").

[27] *See United States v. Mohamed*, 630 F.3d 1, 7 (1st Cir. 2010) ("The officers reasonably suspected [the defendant] was the shooter or at least was a suspect involved in the shooting, which means that he very likely would be armed."); *see also Slater*, 979 F.3d at 631 ("Having concluded that reasonable suspicion existed to justify the stop, we have no trouble concluding further that reasonable suspicion existed to justify the frisk. . . . '[W]here nothing in the initial stages of the encounter serves to dispel [the officer's] reasonable fear for his own or others' safety, he is entitled . . . to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons . . . .'" (first alteration added) (quoting *Terry*, 392 U.S. at 30)).

**IV.** **Conclusion**

Both the stop and frisk of Versteegh were supported by reasonable suspicion. Therefore, we affirm the denial of Versteegh's motion to suppress evidence.

**AFFIRMED.**