**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-1175
_____

UNITED STATES OF AMERICA

v.

LEOVIJILDO MITRA-HERNANDEZ,
                                        Appellant
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 1-19-cr-00067-001)
District Judge: Honorable Malachy E. Mannion
_____

Argued on October 14, 2021

Before:  SHWARTZ, NYGAARD and FISHER, *Circuit Judges.*

(Filed: January 24, 2022)

Ronald A. Krauss
Quin M. Sorenson
Jason F. Ullman  [**ARGUED**]
Office of Federal Public Defender
100 Chestnut Street, Suite 306
Harrisburg, PA 17101
        *Counsel for Appellant*

Stephen R. Cerutti, II  [**ARGUED**]
Bruce D. Brandler, Acting United States Attorney
Office of United States Attorney
Middle District of Pennsylvania
228 Walnut Street, P.O. Box 11754
220 Federal Building and Courthouse

Harrisburg, PA 17108
    *Counsel for Appellee*

———————

OPINION[*]

———————

FISHER, *Circuit Judge.*

Leovijildo Mitra-Hernandez was arrested by Immigration and Customs Enforcement officers in Hanover, Pennsylvania and charged with illegal reentry into the United States in violation of 8 U.S.C. § 1326. But when the officers stopped him, they were looking for someone else they suspected of being in the country illegally—an individual named "Juan Ramiro." Mitra-Hernandez filed a motion to suppress evidence obtained during the stop, which the District Court denied. Mitra-Hernandez then pled guilty, reserving his right to appeal the denial of the suppression motion. Accordingly, he now appeals. We will affirm.[1]

Under the Fourth Amendment, "[w]hen a police officer has 'a reasonable, articulable suspicion that criminal activity is afoot,' he or she may conduct a 'brief, investigatory stop.'"[2] Reasonable suspicion is not a difficult standard to meet, requiring

———————

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

[1] The District Court had jurisdiction under 18 U.S.C. § 3231 (offenses against the laws of the United States). This Court has jurisdiction under 28 U.S.C. § 1291 (final judgments).

[2] *United States v. Whitfield*, 634 F.3d 741, 744 (3d Cir. 2010) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)).

just "a minimal level of objective justification."[3]

"Evidence obtained through unreasonable searches and seizures must," generally speaking, "be suppressed as 'fruit of the poisonous tree.'"[4] An exception to this suppression rule provides that "evidence . . . regarding [a criminal defendant's] true identity and his prior deportation is . . . not subject to suppression."[5] There is an exception to the exception, however: when officers have committed "egregious violations of Fourth Amendment or other liberties that might transgress notions of fundamental fairness and undermine the probative value of the evidence obtained," even the defendant's identity and immigration file may be suppressed.[6]

Mitra-Hernandez argues that (1) his Mexican identification card and his statements to the ICE officers during the stop should be suppressed because there was no reasonable suspicion for the stop, and (2) his identity and immigration file should be suppressed because the Fourth Amendment violation was egregious. We will assume that Mitra-Hernandez is correct on his first argument, but we disagree on his second.

Even if there were a Fourth Amendment violation, it was not egregious. "[E]vidence will be the result of an egregious violation within the meaning of *Lopez-Mendoza*," and therefore is suppressible, if there was "a constitutional violation that was

---

[3] *Id.* (quoting *Wardlow*, 528 U.S. at 123).
[4] *United States v. Bey*, 911 F.3d 139, 144 (3d Cir. 2018) (quoting *United States v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006)).
[5] *United States v. Bowley*, 435 F.3d 426, 430 (3d Cir.), *as amended* (Feb. 17, 2006).
[6] *Id.* (quoting *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1051 (1984)).

fundamentally unfair."[7] To determine egregiousness, we consider whether the violation was "intentional"; whether the seizure was "gross or unreasonable," involving (for example) a "particularly lengthy" stop or "an unnecessary and menacing show or use of force"; whether the defendant's home was illegally entered; whether the officers engaged in "threats, coercion or physical abuse"; and whether the arrest was "based on race or perceived ethnicity."[8] This list of factors is illustrative, not exhaustive, and "the familiar totality of the circumstances must guide the inquiry and determine its outcome."[9]

Mitra-Hernandez asserts that he was stopped based solely on his ethnicity, and that this is enough to hold the Fourth Amendment violation egregious.[10] We disagree that ethnicity was the sole factor. In addition to Mitra-Hernandez's ethnicity, his height matched Juan Ramiro's; his age—38, versus Juan Ramiro's 24—did not rule him out; and early in the morning, he left 22 West Walnut Street, which was given as Ramiro's home address on the traffic ticket. Therefore, Mitra-Hernandez was not stopped merely because he looked Hispanic.

---

[7] *Oliva-Ramos v. Att'y Gen.*, 694 F.3d 259, 278 (3d Cir. 2012).

[8] *Id.* at 279.

[9] *Id.*

[10] To support his argument that a stop based solely on ethnicity is egregious, Mitra-Hernandez cites *Arriaga-Hernandez v. Att'y Gen.*, 712 F. App'x 151, 153 (3d Cir. 2017). His reliance on *Arriaga-Hernandez* is misplaced. To begin with, it is not precedential, and "[s]uch opinions are not regarded as precedents that bind the court." 3d Cir. I.O.P. 5.7. Moreover, the petitioner in *Arriaga-Hernandez* was not stopped "solely because of his apparent ethnicity." 712 F. App'x at 153 (petitioner also had "changed course and walked back to his car" when he spotted immigration agents). Therefore, not only is *Arriaga-Hernandez* non-binding, but the point Mitra-Hernandez relies on is dicta.

There are no other factors that would point toward egregiousness. Mitra-Hernandez's home was not illegally entered. The officers did not threaten or coerce him or make any show of force. By Mitra-Hernandez's own estimate, he was detained for only "[m]aybe twenty, twenty-five minutes."[11] Mitra-Hernandez's testimony largely matched that of the ICE officer, and both witnesses described a peaceful, businesslike roadside stop. Because the violation of Mitra-Hernandez's rights was not egregious, the District Court correctly declined to suppress his identity and immigration file.[12]

Our dissenting colleague takes the position that the initial stop of Mitra-Hernandez was lawful, but that the justification for the stop ended when the officers saw Mitra-Hernandez's Mexican identification card. However, the Eleventh Circuit has held that officers may confirm the identity of an individual who is seen at pre-dawn hours leaving an address associated with a suspected immigration law violator, and who could be the suspect.[13] Put differently, the fact that officers are presented with an identification card bearing a name that differs from the person for whom they are looking does not mean they are not permitted to verify the person's identity.[14] The Eleventh Circuit rejected the contention that "the stop should have ended as soon as the officers observed that [the individual] did not match the [suspect's] physical description . . . and at the latest when

---

[11] App. 84.
[12] *See Bowley*, 435 F.3d at 430-31.
[13] *United States v. Gonzalez-Zea*, 995 F.3d 1297, 1300, 1303-05 (11th Cir.), *cert. denied*, 142 S. Ct. 506 (2021).
[14] *Id.* at 1304-05.

[the individual] told the officers his name."[15] Among other reasons, "[a]sking for an alternate form of identification simply was another identification-related inquiry that was part of the task of verifying [the individual's] identity, which was the purpose of the *Terry* stop," and "although [the individual] stated that he was in the United States illegally . . . , at no point during the stop did the officers investigate another crime or ask questions unrelated to verifying [his] identity and locating the fugitive."[16] We find the Eleventh Circuit's analysis sound and conclude that, similarly here, the officers acted reasonably when they sought to confirm Mitra-Hernandez's identity. Doing so was not egregious, particularly given the other facts the officers knew.

Because the District Court's order denied suppression of "any identity information, physical or testimonial,"[17] and we understand this to deny suppression only

---

[15] *Id.*

[16] *Id.* at 1305. The dissent says that the officer's questions to Mitra-Hernandez betrayed an intent not just to verify Mitra-Hernandez's identity, but to find out if he had committed an immigration violation. The questions, however, were akin to running Mitra-Hernandez's identification card through a database to verify it. *See, e.g., United States v. Guijon-Ortiz*, 660 F.3d 757, 769 (4th Cir. 2011) ("[C]alling ICE to inquire into the validity of the . . . ID is analogous in many ways to how an officer routinely runs a driver's license and registration to check their validity."). The inquiry furthered the permissible goal of verifying Mitra-Hernandez's identity and was not unreasonable. *See United States v. Hutchinson*, 408 F.3d 796, 797 (D.C. Cir. 2005) ("[I]n light of the close match between the lookout description and [the defendant's] appearance, and the proximity in time and place between the assault and the investigative stop, which reasonably prompted concerns whether [the defendant] was the suspect for whom the police were looking, . . . it was reasonable for the police to retain [the defendant's] proffered identification on site for two to five minutes . . . to verify his identification through a computerized records check and allay the officers' reasonable articulable suspicion.").

[17] App. 105.

of Mitra-Hernandez's statement giving his name and his production of his Mexican identification card, the Court correctly denied the motion. His statements that did not pertain to his identity were not covered by the order, and by implication, the Court suppressed the statements concerning other subjects beyond his name and identification card. As a result, the order comported with *Bowley*.[18]

Even if the order contemplated the admission of other statements Mitra-Hernandez made, we need not disturb the District Court's ruling. "[A]n 'otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.'"[19] To obtain a conviction here, the Government needed to prove only that Mitra-Hernandez is an "alien who . . . has been . . . removed . . . and thereafter" was "found in . . . the United States" without having obtained the Attorney General's "express[] consent[]" to a reapplication for admission.[20] These facts can be established through Mitra-Hernandez's identity and immigration file. The Department of Homeland Security's Record of Deportable Alien (Form I-213) says that "[r]ecords checks reveal[] [that] on 07/15/2008, MITRA-HERNANDEZ was ordered removed from the US to Mexico by an Immigration Judge in

---

[18] 435 F.3d at 430.

[19] *United States v. McLaughlin*, 386 F.3d 547, 553 (3d Cir. 2004) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986)).

[20] 8 U.S.C. § 1326(a).

York, PA."[21] Therefore, regardless of any other evidence, Mitra-Hernandez still would be convicted on the basis of his identity and immigration file.

For these reasons, we will affirm.

---

[21] App. 59-60. Indeed, immediately after the arrest, the ICE officer was able to quickly confirm with a coworker back in the office "that in fact the information was true, [Mitra-Hernandez] [had] been detained and ordered removed and had been actually . . . removed." App. 77.

*United States of America v. Mitra-Hernandez*, No. 20-1175

NYGAARD, *Circuit Judge*, dissenting.

I believe that ICE officers violated Leovijildo Mitra-Hernandez's Fourth Amendment right against unreasonable seizure not when they first pulled him over, but when they continued detaining him after learning he was not the man they were looking for. At that point, the officers no longer had a reasonable basis to suspect that Mr. Mitra-Hernandez was involved in illegal activity, and they had to let him go. Their failure to do so violated his constitutional rights. And because the officers' only reasons for continuing to detain Mr. Mitra-Hernandez after they ceased to reasonably suspect him of illegal activity were his nationality and perceived ethnicity, the officers' constitutionally violative seizure was, I believe, egregious. We should accordingly suppress from this criminal prosecution the fruits of that egregious violation, including his statements made to the officers after the detention became unconstitutional and his immigration file, vacate his conviction and sentence, and remand the cause to the District Court. I therefore respectfully dissent.

I also write to question the continuing wisdom of the broad rule we set forth in *United States v. Bowley*, 435 F.3d 426 (3d Cir.), *as amended* (Feb. 17, 2016).

## I. BACKGROUND

Before dawn on December 18, 2018, ICE officers staked out 22 West Walnut Street in Hanover, Pennsylvania for Juan Ramiro, whom they believed to be in the United States illegally. They believed Mr. Ramiro lived at 22 West Walnut Street because a man named Juan Ramiro provided this address to local police while receiving a citation for driving without a license. According to the citation, Mr. Ramiro was then 24 years old. The ICE officers also had a description of Juan Ramiro from an ICE database as "someone of Hispanic descent, about five foot seven." App. 76. And at 5:45 am, the officers watched 38-year-old, five-foot-seven appellant Leovijildo Mitra-Hernandez, whom they believed "match[ed] the characteristics of" Juan Ramiro, leave 22 West Walnut Street and drive off. *Id.*

The Officers tailed Mr. Mitra-Hernandez briefly before pulling him over. They then approached his vehicle, with Officer Cabrera on the driver's side and Officer Lutz on the passenger side. After identifying himself as an ICE officer, Officer Cabrera asked Mr. Mitra-Hernandez for identification. Mr. Mitra-Hernandez asked why they stopped him, and the officer replied that they were conducting an investigation and asked again for identification. Mr. Mitra-Hernandez handed over his Mexican ID card, which identified him not as Juan Ramiro, but as Leovijildo Mitra-Hernandez.

Officer Cabrera then asked Mr. Mitra-Hernandez a series of questions to which he responded honestly and directly: Where was Mr. Mitra-Hernandez born? Mexico. What country was he a citizen of? Mexico. Did he have any documents stating that he could legally be in the United States? No. Had he been deported from the United States? Yes, once. Did he apply for permission to reenter the country, or did he have any immigration application pending? No. Did he reenter the country illegally? Yes. Some portion of Officer Cabrera's conversation with Mr. Mitra-Hernandez was in Spanish, but the point at which the conversation shifted to Spanish is unclear, and the District Court's recitation of the facts did not resolve that discrepancy.[1] After Mr. Mitra-Hernandez said that he had reentered the country illegally, Officer Cabrera arrested him, handcuffed him, and placed him in the back of his service vehicle. Before driving him back to the station, Officer Cabrera called his supervisor, who confirmed that Mr. Mitra-Hernandez had been removed from the United States.

After being criminally charged with illegally reentering the United States, Mr. Mitra-Hernandez moved to suppress "all identity evidence, physical and testimonial, in accordance with the Fourth Amendment, as fruit of the unlawful stop, seizure and interrogation." App. 31. The District Court held a suppression hearing at which Officer Cabrera testified. The Court then denied the motion without determining whether there was a Fourth Amendment violation, reasoning that because the alleged violation of Mr. Mitra-Hernandez's rights was not like that in *Rochin v. California*, 342 U.S. 165 (1952)—one of the cases cited by the Supreme Court in *I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032 (1984), as an example of an "egregious violation"—it was not egregious, and this Court's holding in *United States v. Bowley*, 435 F.3d 426 (3d Cir. 2006), accordingly barred suppression of "any identity information, physical or testimonial, regardless of whether the ICE officers violated his rights in this case." App. 105.

Mr. Mitra-Hernandez accepted a conditional guilty plea, was sentenced, and now appeals the denial of his suppression motion and argues that his judgment of conviction and sentence should be reversed.

## II.    DISCUSSION

---

[1]     According to Officer Lutz's Form I-213, written the same day as the arrest, the whole conversation was in Spanish. App. 70. According to Officer Cabrera's more detailed description of the encounter written one month later in his Memorandum of Investigation, Form G-166C, Officer Cabrera did not switch to speaking Spanish until after Mr. Mitra-Hernandez handed him his Mexican National Identification Card. App. 61. But at the District Court's suppression hearing nearly eight months after the conversation, Officer Cabrera testified that he switched to Spanish just before Mr. Mitra-Hernandez handed over his Mexican ID. App. 76 at 8:2–7.

I believe that we must decide whether the officers violated Mr. Mitra-Hernandez's Fourth Amendment rights, not only to vindicate his rights, but to understand how the officers' violation of his rights was based solely on his nationality and perceived ethnicity, and therefore egregious.

"A traffic stop, even if brief and for a limited purpose, 'constitutes a "seizure" of "persons" within the meaning of [the Fourth Amendment].'" *United States v. Clark*, 902 F.3d 404, 409 (3d Cir. 2018) (alteration in original) (quoting *Whren v. United States*, 517 U.S. 806, 809–10 (1996)). A law enforcement officer with a reasonable, articulable suspicion of a vehicle occupant's involvement in criminal activity may conduct a traffic stop. *United States v. Lewis*, 672 F.3d 232, 237 (3d Cir. 2012). "[R]easonable suspicion unequivocally demands that the detaining officers must have a particularized and objective basis for suspecting the particular person stopped for criminal activity." *United States v. Bey*, 911 F.3d 139, 145 (3d Cir. 2018).

The officers here reasonably suspected that the man who left 22 West Walnut Street that morning was Juan Ramiro, whom they believed was in the country illegally; thus, reasonable suspicion supported the stop. They had received a traffic citation from local police stating that Juan Ramiro was living at 22 West Walnut Street. While their description of Juan Ramiro as a five-foot-seven inches tall, 24-year-old man of Hispanic descent was unquestionably general, the few details they had from that description, combined with their knowledge that Juan Ramiro lived in a specific house, gave the officers articulable, particularized suspicion that the about five-foot-seven inches tall Hispanic-looking man, who left 22 West Walnut Street that morning as if he lived there, was Juan Ramiro. *Compare Bey*, 911 F.3d at 142–43, 46 (concluding that a description of a suspect as a 160–170 pound Black man with a red hoodie and dark blue pants gave officers reasonable suspicion to briefly detain an about 200 pound Black man who they saw from behind in a red hooded jacket and black pants close by where police reasonably expected the suspect to be), *with United States v. Brown*, 448 F.3d 239, 242, 252 (3d Cir. 2006) (concluding that a description of suspects as two 15 to 20-year-old Black males of specified heights in dark clothing, along with an unreliable location tip, did not give officers reasonable suspicion to seize two around 30-year-old Black men of the same heights with full beards).

But when the officers discovered that the man they pulled over was not Juan Ramiro, they no longer had a reasonable basis to suspect their detainee of involvement with illegal activity. "Though a stop may be lawful at its inception . . ., it could become unreasonable, and thus violate the Constitution's proscription, at some later time." *Clark*, 902 F.3d at 409 (internal quotation marks omitted). "'Once reasonable suspicion has been dispelled, even a very brief extension of detention without consent or reasonable suspicion violates the Fourth Amendment.' An investigative stop must therefore cease once reasonable suspicion dissipates." *Bey*, 911 F.3d at 147 (citation footnote omitted) (quoting *United States v. De La Cruz*, 703 F.3d 1193, 1197 (10th Cir. 2013)).

3

Once the officers saw Mr. Mitra-Hernandez's Mexican ID card with his name and age on it, their justification for the stop disappeared. They were looking for a 24-year-old named Juan Ramiro, and they had pulled over a 38-year-old named Leovijildo Mitra-Hernandez. They had the wrong man.[2] At that point, absent reasonable suspicion that Mr. Mitra-Hernandez was involved in unlawful activity, the officers had to end the traffic stop and let Mr. Mitra-Hernandez go.

My colleagues in the majority cite *United States v. Gonzalez-Zea*, 995 F.3d 1297 (11th Cir. 2021) to support their conclusion that the officers' continued detention and questioning of Mr. Mitra-Hernandez after he gave them his Mexican ID was justified because the officers were merely verifying that he was who he said he was. But Officer Cabrera's questions—where was he born, what country was he a citizen of, did he have documents legitimizing his presence in the United States, had he been deported, had he reentered the country illegally—do not suggest that the officer was verifying the identity of the man he had detained. Rather, those questions betray an intent to find out if the man had committed a crime or immigration violation independent of whether he was Juan Ramiro or Leovijildo Mitra-Hernandez. Because I believe that once the officers saw Mr. Mitra-Hernandez's Mexican ID stating his real name and age, the officers no longer thought he was the much-younger Juan Ramiro and thus no longer had a reasonable basis to suspect that he was in the country illegally, I also believe that at that point they were constitutionally required to end the seizure. *See Bey*, 911 F.3d at 147.

The Government presses a similar argument, contending that "so long as the DHS officers were justified in effectuating the initial stop (which they were), they were also justified in engaging in routine law enforcement questioning which, in this case, included a question regarding Mitra-Hernandez's immigration status." Appellee's Br. at 22. But the cases the Government cites for this proposition involve either questioning during a valid detention or "consensual" questioning outside of a detention. *See Muehler v. Mena*, 544 U.S. 93, 101–02 (2005) (holding that questioning a detainee about their immigration status during a valid, warrant-supported residential search does not require independent reasonable suspicion); *Florida v. Bostick*, 501 U.S. 429, 434–35 (1991) (citations omitted) (emphasis added to portion of sentence omitted from the Government's brief) ("We have stated that even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; ask to examine the individual's identification; and request consent to search his or her luggage—*as long as the police do not convey a message that compliance with their requests is required*."); *Rodriguez v. United States*, 575 U.S. 348, 355 (2015) (emphasis added) ("An officer, in other words, may conduct certain unrelated checks during an *otherwise lawful* traffic

---

[2]   *See, e.g.*, *Brown*, 448 F.3d 239, 248 (3d Cir. 2006) (A fifteen-year age difference between the perceived age of a suspect and the actual age of a detainee cuts against reasonable suspicion).

stop."). These cases do not involve seizures in which an officer keeps detaining a person after realizing their basis for the detention is unfounded. Once the officers no longer had a reasonable basis to suspect that the person they pulled over was in the country illegally, they had to end the traffic stop. *See Bey*, 911 F.3d at 147.

The Government argues in the alternative that by the time they learned Mr. Mitra-Hernandez's true name and age from his ID card, they had developed reasonable suspicion that even if he were not Juan Ramiro, Mr. Mitra-Hernandez may be in the country illegally. Their purported reasons for that suspicion are that he left a house where at least one person believed to be in the country illegally lived, he had trouble speaking English and preferred speaking Spanish, and he gave ICE officers a Mexican ID card. Appellee's Br. at 20–21.

The belief that one resident of a house is in the country illegally does not support individualized reasonable suspicion that all other residents of that house are also in the country illegally; the transitive property does not apply to household members' immigration status. *See, e.g.*, *Davila v. N. Reg'l Joint Police Bd.*, 370 F. Supp. 3d 498, 517 (W.D. Pa. 2019) (Hornak, C.J.) ("[I]t would be entirely inappropriate for Officer Bienemann to submit [the driver]'s information to ICE merely because her passenger admitted to being in the United States illegally.") (citing *De La Cruz*, 703 F.3d at 1198 ("When the agents apprehended [the passenger], they discovered he was illegally in the United States. That is a status crime, which would not necessarily suggest that the driver of the vehicle from which he fled was also involved in criminal activity.")); *cf. United States v. Ramos*, 443 F.3d 304, 309 (3d Cir. 2006) (finding that while officers smelling marijuana in a crowded bar would not have individualized reasonable suspicion to pat down every patron, officers smelling marijuana while driving between two parked cars had individualized reasonable suspicion that the odor came from either car).

And the other two factors cited by the Government to justify the extended stop—that Mr. Mitra-Hernandez had trouble speaking English and gave ICE officers a Mexican ID card—share a common thread: they are innocent details closely related to Mr. Mitra-Hernandez's ethnicity and nationality that do not shed light on the legality of his presence in the country. *See, e.g.*, *United States v. Manzo-Jurado*, 457 F.3d 928, 937 (9th Cir. 2006) (citation omitted) ("An individual's inability to speak English may support an officer's reasonable suspicion that the individual is in this country illegally. By itself, however, an individual's inability to understand English will not justify an investigatory stop because the same characteristic applies to a sizable portion of individuals lawfully present in this country.").

To be sure, those factors could be combined with some other observation that would give a reasonable immigration officer individualized suspicion of illegality. But without some articulable, particularized fact about Mr. Mitra-Hernandez supporting the belief not only that he was an alien, but that he was an alien in the country illegally, the

officers could not subject him to even a brief detention without violating his Fourth Amendment rights. *Cf. Lee v. INS*, 590 F.2d 497, 498, 502 (3d Cir. 1979) (immigration officer had reasonable suspicion to conduct brief investigative detention based on observing men speaking in Chinese and wearing clothing normally worn by restaurant workers while near a restaurant known by officer to have employed illegal aliens, combined with one of the men appearing extremely nervous and trying to flee initial, non-custodial questioning); *Babula v. INS*, 665 F.2d 293, 297 (3d Cir. 1981) (immigration officer had reasonable suspicion to conduct brief investigative detention based on reliable tip that factory employed Polish illegal aliens, observing employees speaking Polish, and two employees trying to flee initial questioning).

And if we credit the order of events in Officer Cabrera's January 17, 2019 Memorandum of Investigation (App. 61) written one month after his interaction with Mr. Mitra-Hernandez, rather than his suppression hearing testimony (App. 76) given nearly eight months after the interaction or his partner's scant recollection of the interaction (App. 70), Officer Cabrera did not know that Mr. Mitra-Hernandez struggled to speak English and preferred Spanish until after Mr. Mitra-Hernandez provided his Mexican ID with his name and age. That would leave Mr. Mitra-Hernandez presenting a Mexican ID card as the only purported basis for Officer Cabrera's reasonable suspicion that Mr. Mitra-Hernandez was not only an alien, but in the country illegally. Foreign citizenship alone cannot support such an inference. *See Orhorhaghe v. I.N.S.*, 38 F.3d 488, 497 (9th Cir. 1994) (internal quotation marks removed) ("The specific facts articulated by the agents must provide a rational basis for separating out the illegal aliens from American citizens and legal aliens."); *United States v. Weaver*, 9 F.4th 129, 155 (2d Cir. 2021) (Lohier, J., concurring) ("A court should ask, holding all else equal: 'Would an officer have reasonable suspicion if the defendant were of a different race?' If the answer is 'no,' the fact that the defendant is, say, African American does not tip the balance of the totality of the circumstances. Bias, explicit or implicit, is an unreasonable basis for suspicion.").

As the officers no longer had a reasonable basis to suspect that Mr. Mitra-Hernandez was an undocumented immigrant named Juan Ramiro once they saw Mr. Mitra-Hernandez's identification, and the officers did not otherwise have a legitimate reason to suspect that Mr. Mitra-Hernandez was in the country illegally, the officers violated Mr. Mitra-Hernandez's Fourth Amendment right against unreasonable seizure.

When that violation occurred, the facts that supported the officers' initial belief that they had pulled over Juan Ramiro—Mr. Mitra-Hernandez's perceived ethnicity, his height, and the fact that he left the West Walnut Street address that they had for Mr. Ramiro—no longer mattered. His continued detention was not based on the officers' now-dispelled belief that he was Mr. Ramiro, but rather on a newly developed belief, that Mr. Mitra-Hernandez himself was in the country illegally. That belief was premised, as the Government concedes, on three facts: "Mitra-Hernandez had left a residence believed

to be housing at least one individual who was in the country illegally, had difficulty communicating in English, and could only present an identification card from a country other than the United States after being informed he was interacting with DHS officers." Appellee's Br. at 20-21. Still, none of those facts create a permissible inference that Mr. Mitra-Hernandez was in the country illegally. Rather, those facts are either irrelevant (his residence) or intertwined with Mr. Mitra-Hernandez's nationality (his Mexican ID card) and perceived ethnicity (his language). I believe that the officers continued to detain Mr. Mitra-Hernandez based solely on his nationality and perceived ethnicity, and that a Fourth Amendment-violative seizure based only on such impermissible characteristics satisfies this Court's and the Supreme Court's egregiousness requirement and warrants exclusion of the egregiously unconstitutional seizure's evidentiary fruits.

Generally, "[w]here reasonable suspicion for the traffic stop is lacking, the evidentiary fruits of the traffic stop must be suppressed." *Lewis*, 672 F.3d at 237. In *Lopez-Mendoza*, however, the Supreme Court held that the exclusionary rule does not apply in civil deportation proceedings and stated that "[t]he 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred." 468 U.S. at 1039, 1050. The Court qualified its opinion with the statement that "we do not deal here with egregious violations of Fourth Amendment or other liberties that might transgress notions of fundamental fairness and undermine the probative value of the evidence obtained." *Id.* at 1050–51.

In *Bowley*, a panel of this Court on which I sat observed that "a number of other courts of appeals have . . . refused to suppress a defendant's immigration file or identity in the context of a criminal prosecution for illegal reentry in violation of § 1326," and concluded, "absent the kind of egregious circumstances referred to in *Lopez–Mendoza*, we hold that the Fourth Amendment does not provide a basis for an alien to suppress his/her immigration file, or information in that file." 435 F.3d at 430–31.

In *Oliva-Ramos v. Attorney General*, this Court adopted the rule that "evidence will be the result of an egregious violation within the meaning of *Lopez–Mendoza*, if the record evidence established either (a) that a constitutional violation that was fundamentally unfair had occurred, or (b) that the violation—regardless of its unfairness—undermined the reliability of the evidence in dispute." 694 F.3d 259, 278 (3d Cir. 2012). That rule was first promulgated, with a slight difference not relevant here, by the United States Court of Appeals for the Second Circuit in *Almeida-Amaral v. Gonzales*, 461 F.3d 231, 235 (2d Cir. 2006). *See Oliva-Ramos*, 694 F.3d at 277–78. In adopting the rule, this Court also adopted the Court of Appeals for the Second Circuit's reasoning. *Id.* at 278 (citing *Almeida-Amaral*, 461 F.3d at 235).

7

After adopting the modified *Almeida-Amaral* rule defining egregiousness, this Court laid out several factors that courts and immigration hearing officers should use to determine whether a Fourth Amendment violation is fundamentally unfair:

> whether [the party seeking suppression] can establish intentional violations of the Fourth Amendment, whether the seizure itself was so gross or unreasonable in addition to being without a plausible legal ground, (e.g., when the initial illegal stop is particularly lengthy, there is an unnecessary and menacing show or use of force, etc.), whether improper seizures, illegal entry of homes, or arrests occurred under threats, coercion or physical abuse, the extent to which the agents reported to unreasonable shows of force, and finally, whether any seizures or arrests were based on race or perceived ethnicity.

*Oliva-Ramos*, 694 F.3d at, 279; *see also Almeida-Amaral*, 461 F.3d at 235 ("[E]ven where the seizure is not especially severe, it may nevertheless qualify as an egregious violation if the stop was based on race (or some other grossly improper consideration).").

Implicit in the *Oliva-Ramos* factors is the concern that certain seizures are egregious because they implicate a detainee's constitutional rights beyond unjustified detention. For instance, the Fourth Amendment bars the use of excessive force during a seizure, *see Graham v. Connor*, 490 U.S. 386, 395 (1989), while a seizure based solely on a suspect classification like race, perceived ethnicity, or national origin[3] violates the constitutional prohibition against denying any person the equal protection of law, *see Whren*, 517 U.S. at 813 (The Equal Protection Clause bars selective law enforcement based on considerations like race.).

The Supreme Court's statement about egregious violations in *Lopez-Mendoza* supports such a reading. It disclaims barring application of the exclusionary rule not only to egregious Fourth Amendment violations, but also to "egregious violations of . . . other liberties." *Lopez-Mendoza*, 468 U.S. at 1050. It also voices concern about "fundamental fairness," *id.*, a phrase synonymous with Due Process rights. *See, e.g.*, *Lassiter v. Dep't of Soc. Servs. of Durham Cty.*, 452 U.S. 18, 24, (1981) ("[T]he phrase ['due process'] expresses the requirement of 'fundamental fairness[.]'") It is thus my belief that the egregiousness exception looks to whether the unreasonable search or seizure implicates other constitutional violations or has other unconstitutional dimensions.

Here, the violation raises equal protection concerns because the officers' unlawful seizure of Mr. Mitra-Hernandez was entirely based on his alienage and perceived

---

[3]      *See Mass Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 & n.4 (1976) (per curiam) (alienage and ancestry are suspect classifications); *see also United States v. Williams*, 124 F.3d 411, 422 (3d Cir. 1997) (national origin and alienage are suspect classifications).

ethnicity. When they learned Mr. Mitra-Hernandez was not Juan Ramiro, the officers no longer had a basis to reasonably suspect he was in the country illegally. They were left only with the facts that he spoke Spanish and had a Mexican ID card, and on that basis alone they continued to detain and question him. That aspect of the seizure implicates Mr. Mitra-Hernandez's Fifth Amendment equal protection right. [4]

Comparison to the Second Circuit Court of Appeals' opinion in *Almeida-Amaral* proves useful. In *Almeida-Amaral*, a border patrol agent stopped Mr. Almeida-Amaral with "no valid reason or suspicion to justify his stop," and after Mr. Almeida-Amaral showed the agent his Brazilian passport in response to a request for identification, the agent arrested him, prompting removal proceedings against Mr. Almeida-Amaral for being in the country illegally. 461 F.3d at 231, 236. The Second Circuit Court of Appeals found that while Mr. Almeida-Amaral's seizure was invalid, it was not egregious, because "Almeida-Amaral offers nothing other than his own intuition to show that race played a part in the arresting agent's decision. Almeida-Amaral asserts, in an affidavit, that the agent stopped him because of his race. But he alleges no facts adequate to support that belief." *Id.* at 237. "Because of the absence of evidence that the stop was race-based, we conclude that Almeida-Amaral has not established that the Fourth Amendment violation was an egregious one." *Id.*

In contrast, the Government here asserts three reasons for the constitutionally violative extension of Mr. Mitra-Hernandez's detention—he lived in a house at which officers believed an illegal alien also lived, he gave Officer Cabrera a Mexican ID card, and (assuming he provided his ID after this was made clear to Officer Cabrera) he struggled to speak English and preferred Spanish—all of which are either irrelevant or intertwined with Mr. Mitra-Hernandez's nationality and perceived ethnicity. And nationality and perceived ethnicity do not and cannot, on their own, imply illegality.

### III.    CONCLUSION

I believe that because the officers violated Mr. Mitra-Hernandez's Fourth Amendment rights and that violation hinged on his nationality, the violation was egregious and warrants exclusion of its evidentiary fruits, including Mr. Mitra-Hernandez's statements made to Officer Cabrera after handing over his ID card, statements he made while in custody after being arrested, the results of Officer Cabrera calling in Mr. Mitra-Hernandez's name to his superiors, and Mr. Mitra-Hernandez's immigration file. I therefore respectfully dissent.

---

[4]     The Due Process Clause of the Fifth Amendment bars the federal government from denying people the equal protection under law just as the Equal Protection Clause of the Fourteenth Amendment does the states. *United States v. Windsor*, 570 U.S. 744, 774 (2013) ("The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws.").

## IV.    CODA

I also write to question our requirement that, for Mr. Mitra-Hernandez to suppress the fruits of the unconstitutional seizure underlying this criminal prosecution, he must prove not only that his constitutional rights were violated, but that they were violated egregiously.

In *Bowley*, we read the word "identity" broadly, concluding that *Lopez-Mendoza* precludes suppression not only of a litigant's body or name, but also of evidence of their identity, including an alien's immigration file and the information in that file. 435 F.3d at 431. We supported that conclusion by noting that an alien "has no reasonable expectation of privacy in a file that is maintained solely by a government agency for official purposes and kept in the custody of that agency" and "has no possessory or proprietary interest in his/her immigration file or the documentary evidence contained in that file." *Id.* at 431. And the identity information we concluded was non-suppressible in *Bowley* included the defendant's fingerprints. *Id.* at 428–29.

We also stated in *Bowley* that "[a]lthough we have not previously addressed this precise question, a number of other courts of appeals have addressed it, and each has refused to suppress a defendant's immigration file or identity in the context of a criminal prosecution for illegal reentry in violation of § 1326." 435 F.3d at 430. But we may have failed to notice *United States v. Guevara-Martinez*, in which the Eighth Circuit Court of Appeals affirmed suppression of a Section 1326 criminal defendant's fingerprints—the kind of identity evidence *Bowley* treated as non-suppressible. 262 F.3d 751, 754 (8th Cir. 2001). And in the time since we decided *Bowley*, three more of our sister Circuit Courts of Appeals have disagreed with its rationale and resolution. *See, e.g.*, *Pretzantzin v. Holder*, 736 F.3d 641 (2d Cir.), *as amended* (Sept. 16, 2013); *United States v. Oscar-Torres*, 507 F.3d 224 (4th Cir. 2007); *United States v. Olivares-Rangel*, 458 F.3d 1104 (10th Cir. 2006).

Those Courts contend that the "identity statement" in *Lopez-Mendoza*—that a defendant's body or identity is never suppressible as a fruit of an unlawful arrest—is not a new rule barring suppression of identity-related evidence, but rather a restatement of "the long-standing rule, known as the *Ker-Frisbie* doctrine, that illegal police activity affects only the admissibility of evidence; it does not affect the jurisdiction of the trial court or otherwise serve as a basis for dismissing the prosecution." *Oscar-Torres*, 507 F.3d at 228 (quoting *Olivares-Rangel*, 458 F.3d at 1110); *Pretzantzin v. Holder*, 736 F.3d at 647 (same); *Guevara-Martinez*, 262 F.3d at 754 (same). Their arguments are, in brief, as follows.

"First, all of the authority that the Supreme Court cites in support of its 'identity statement' in *Lopez-Mendoza* addresses a court's jurisdiction over a defendant himself,

*not* suppression of unlawfully obtained evidence relating to his identity." *Oscar-Torres*, 507 F.3d 224, 228 (4th Cir. 2007). "*Lopez-Mendoza*'s reliance on the *Ker-Frisbie* line of authority in support of its identity statement leaves no doubt that the Court was referencing the long-standing jurisdictional rule that an unlawful arrest has no bearing on the validity of a subsequent proceeding rather than announcing a new rule insulating all identity-related evidence from suppression." *Pretzantzin*, 735 F.3d at 648; *see also Olivares-Rangel*, 458 F.3d at 1110 (same); *Guevara-Martinez*, 262 F.3d at 754 (same).

"The limited scope of *Lopez–Mendoza* is also clear from analyzing the two separate proceedings in that case." *Olivares-Rangel*, 458 F.3d at 1111. "The Court's differing treatment of [one defendant] Lopez-Mendoza's personal jurisdiction challenge and [the other defendant] Sandoval-Sanchez's evidentiary challenge, and the corresponding omission of any identity-related considerations from the evaluation of the latter claim, show that *Lopez-Mendoza*'s identity statement merely confirmed the jurisdictional rule that an unlawful arrest has no bearing on the validity of a subsequent proceeding; the Court did not announce a new rule insulating all identity-related evidence from suppression." *Pretzantzin*, 736 F.3d at 647–48; *see also Oscar-Torres*, 507 F.3d at 228–29 (same); *Guevara-Martinez*, 262 F.3d at 753–54 (same).

"Finally, other Supreme Court precedent, both prior and subsequent to *Lopez-Mendoza,* . . . specifically held that in some circumstances the exclusionary rule *requires* suppression of the very kind of identity evidence at issue [in these cases and *Bowley*]—fingerprint evidence. . . . These cases fatally undermine the Government's contention that *Lopez-Mendoza* bars suppression of all identity evidence in criminal proceedings." *Oscar-Torres*, 507 F.3d at 229-30 (citations omitted) (citing *Hayes v. Florida*, 470 U.S. 811 (1985) and *Davis v. Mississippi*, 394 U.S. 721 (1969)). "[I]f identity-related evidence includes fingerprints, and *Lopez-Mendoza* precludes the suppression of all identity-related evidence, then what are we to make of controlling precedent mandating the suppression of this insuppressible evidence?" *Pretzantzin*, 736 F.3d at 650; *see also Olivares-Rangel*, 458 F.3d at 1111–12 (same); *Guevara-Martinez*, 262 F.3d at 754 (same).

The Tenth Circuit Court of Appeals also challenged our emphasis in *Bowley* on defendants' lack of a possessory interest in the evidence they sought to suppress, stressing that "[w]hile the fruit of the poisonous tree doctrine applies only when the defendant has standing regarding the Fourth Amendment *violation* which constitutes the poisonous tree, the law imposes no separate standing requirement regarding the *evidence* which constitutes the fruit of that poisonous tree." *Olivares-Rangel*, 458 F.3d at 1117; *id.* at 1117–19. The Court used *Wong Sun*, the seminal fruit of the poisonous tree case, as an example, because *Wong Sun* held that a defendant had standing to seek suppression of drugs found at his co-defendant's house where those drugs were "come at by the exploitation of" the defendant's unlawful arrest and subsequent statements informing officers of the drugs at his co-defendant's house. *Id.* at 1117.

11

In *Bowley*, "we doubt[ed] that the Court lightly used such a sweeping word as 'never' in deciding when identity may be suppressed as the fruit of an illegal search of arrest." 435 F.3d at 430. After carefully reviewing the opinions of the Second, Fourth, Eighth and Tenth Circuit Courts of Appeals on the same subject, I worry that we focused too much on the word "never" and not enough on the most important word in *Lopez-Mendoza*'s "identity statement"—"identity." Our sister Courts' arguments persuade me that this Court should seriously reconsider our opinion in *Bowley* and what *Lopez-Mendoza*'s identity statement means for criminal defendants.